Thomas A. Burnett, Esq. (#026509)
BURNETT LAW OFFICE, PLC
1744 South Val Vista Drive, Suite 208
Mesa, AZ 85204
(480) 347-9116
tom.burnett@burnettlawaz.com

Mark D. Pierce (TX #15995500)
Paula K. Knippa (TX #24049103)
SLACK & DAVIS, LLP
2705 Bee Cave Road, Suite 220
Austin, Texas 78746
Telephone: (512) 795-8686
Facsimile: (512) 795-8787
mpierce@slackdavis.com
pknippa@slackdavis.com

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| JOHN DESCH, a married individual;<br><br>Plaintiff,<br><br>v.<br><br>ALLEGIANT AIR, LLC, a Nevada Corporation; JOHN and JANE DOE I-X; and ABC COMPANIES I-X,<br><br>Defendants. | NO. CV-12-2504-PHX-MHB<br><br>PLAINTIFF'S RESPONSE TO DEFENDANT ALLEGIANT AIR, LLC'S MOTION FOR SUMMARY JUDGMENT |

Plaintiff John Desch ("Desch") asks the Court to deny Defendant Allegiant Air, LLC's Motion for Summary Judgment because sufficient summary judgment evidence has been submitted with this response to create a genuine issue of material fact as to whether (1) Allegiant negligently maintained the emergency slides, rendering the aircraft unairworthy and imperiling the emergency evacuation process in which Desch was injured, (2) Allegiant negligently maintained the constant speed drive ("CSD") and generator on the aircraft's right engine, and (3) Allegiant's negligence in these respects not only put all of those aboard at risk, but proximately caused Desch's injury.

## I. BACKGROUND FACTS

*The emergency evacuation of Flight No. 645*

On July 25, 2010, the crew of Allegiant Air flight number 645 declared an emergency and diverted the flight to Flagstaff, Arizona because of a cockpit indication of an in-flight fire condition in the right engine. **SOF ¶1**. Once on the ground, the decision was made to conduct an emergency evacuation of the approximately one hundred and fifty four persons aboard the aircraft via the emergency exit slides. **SOF ¶2**.

Unfortunately, not a single one of the emergency exit slides functioned as it was supposed to. **SOF ¶3**. The emergency exit slides are designed to "auto deploy" but failed to do so. **SOF ¶4**. In fact, one of the slides could not be deployed at all because the slide pack fell backwards *into the cabin*. **SOF ¶5**. The failure of the slides to deploy under emergency conditions required the flight attendants to try to manually inflate them even as passengers crowded into the aisle and headed towards the aircraft's exits. **SOF ¶6**. This caused some passengers to have to reroute their emergency egress from the one of the emergency exits to the tail cone exit. **SOF ¶7**.

In yet another case, one of the passengers, Mr. Nathaniel Odle, seated in an emergency exit row, released the emergency door lock but was unable to open the door because the seats themselves were positioned in a way that prevented the door from opening. **SOF ¶8**. According to Mr. Odle, "this caused panic." **SOF ¶9**. Mr. Odle went on to describe the evacuation process as follows: "People all around me were frantic and in a panic trying to exit the plane. The fact that the emergency exit door next to me was partially blocked by the seats made it at first impossible to open and wasted precious time before it would open. This caused increased panic in the evacuation process." **SOF ¶10**.

According to passengers aboard flight number 645, this after-landing panic was exacerbated by the cabin crew repeatedly and urgently shouting "evacuate!" into the intercom. **SOF ¶11**. They reported that the flight crew "started hollering" with a megaphone to evacuate the plane and "jump and slide." **SOF ¶12**. Others recalled that the flight attendants were not calm during the evacuation, but rather were "yelling" "Don't look! Keep moving! Jump!" at the passengers. **SOF ¶¶13–¶16**. This created a sense of panic among the passengers resulting in a lot of "pushing and shoving" with people screaming, yelling, and crying. **SOF ¶17**.

At one point, a pile-up of people occurred at the bottom of one of the slides when an elderly lady who had slid onto the tarmac was struck by another person. **SOF ¶18**. In fact, multiple passengers other than Desch sustained injuries from jumping onto the evacuation slides. **SOF ¶19**. At least four passengers were transported to Flagstaff Medical Center for injuries "that required more treatment than they were able to provide on the field." **SOF ¶¶20–22**.

### *The injuries sustained by Desch as a result of the emergency evacuation*

John Desch was on the flight with his wife and parents, returning home after visiting his brother in Bozeman, Montana. **SOF ¶23**.

When the order to "evacuate! evacuate!" was made over the intercom, Desch started moving to the exit. **SOF ¶24**. Like the other passengers, Desch was ordered to "jump and slide" out onto one of the emergency slides. **SOF ¶26**. Unlike the other passengers, Desch had recently undergone complicated neck surgery only six weeks before this incident. **SOF ¶30**.

Desch jumped out of the airplane and threw his legs in front of him. **SOF ¶26**. He landed about three quarters of the way down the slide, but then bounced off the slide, hitting the ground. **SOF ¶¶26–27**. In hitting the ground, Desch landed "sideways" but managed to catch himself with his arm before he fell on to his back. **SOF ¶¶28–29**.

Dr. Todd Doerr, a board-certified orthopedic surgeon in Phoenix, Arizona, who has served as Chair of Orthopedic Surgery at Thompson Peak Hospital and is currently Chair of Surgery at that hospital, performed an independent medical examination of Desch. **SOF ¶¶33–34**. Dr. Doerr observed that Desch now has persistent chronic shoulder pain in his left upper shoulder from labral tearing and detachment of that shoulder, which is consistent with the mechanism of falling onto an outstretched hand as Desch did after bouncing from the emergency slide. **SOF ¶35**. In Dr. Doerr's expert medical opinion, Desch sustained a direct aggravation of his pre-existing cervical spine condition as a result of his fall from the slide. **SOF ¶33**. Further, according to Dr. Doerr, Desch still needs surgery for the shoulder tear. **SOF ¶33**. Dr. Doerr also recommends an additional spinal operation for Desch to further address the now-aggravated condition of his spine. **SOF ¶38**.

*An emergency evacuation caused by a pattern of negligent maintenance by Allegiant*

The Federal Aviation Administration (FAA) attributed the event to "an inflight component failure." **SOF ¶40**. Allegiant believes the problem that caused the crew to shut down the right engine was either a fire or an overheating condition. **SOF ¶41**.

According to Leonard Swope, who has 45 years of experience as an aircraft mechanic, which included 35 years as an FAA airworthiness safety inspector and 14 years as a Principal Maintenance Inspector for a commercial airline, the origin of the fire

or overheating condition was most likely the Constant Speed Drive (CSD) on the right engine of the aircraft or the alternating current (AC) generator to which it is connected.[1] **SOF ¶42; 63**.

The Flagstaff airport fire department opened the cowling on the right engine and observed that the generator had suffered a catastrophic failure. **SOF ¶43**. Allegiant sent the engine for post-incident examination to a test facility called TIMCO to conduct a failure analysis, but apparently removed the CSD and the generator before shipping the engine. **SOF ¶¶46–47**. Thus, although TIMCO cited the reason for its examination of the engine as "Generator fire/Oil leak," it was not provided with the CSD or generator by Allegiant. **SOF ¶¶47–48**. TIMCO's report consequently fails to identify the cause of the in-flight engine fire condition warning light in the cockpit, which led to the decision to make an emergency landing and evacuation. **SOF ¶¶48–49**.

A review of the aircraft's maintenance records reflect that, more likely than not, there was an excessive oil consumption in the CSD that Allegiant serviced by merely adding oil instead of properly repairing or replacing the malfunctioning part. **SOF ¶44**. Adding oil without addressing the underlying defective condition of the CSD would constitute negligence in the maintenance of a commercial aircraft. **SOF ¶45**.

Allegiant's records show 19 consecutive service checks with zero discrepancies; had the service checks been performed correctly, Allegiant's mechanics would, more likely than not, have encountered multiple discrepancies on routine maintenance checks.

---

[1] It should be noted that Allegiant repeatedly criticizes Mr. Swope for not having inspected the aircraft or its emergency slides, engine, CSD or generator, but, as this Court correctly observed in its April 16, 2014 order: "[A]n inspection of the plan long after the repairs had been made … would not provide any useful information."

**SOF ¶50**. Allegiant's maintenance records for the month preceding the incident are not credible because they show *zero* discrepancies. **SOF ¶51**. The absence of such log entries for repair of discrepancies is indicative of a "pencil-whipped" log book. **SOF ¶52**.

Poor maintenance of the CSD/generator is indicated by Allegiant's records showing an abnormally large number of instances of overheating of the CSD requiring oil servicing. **SOF ¶53**. The overheating events in Allegiant's logs are evidence of the unit using oil. **SOF ¶54**. Proper maintenance procedures for Allegiant's reliability program should have included a requirement that the amount of oil added be recorded. **[SOF ¶55]** Allegiant's records do not even contain a block for indicating the amount of oil added in the maintenance and flight log nor does it have a procedure to record the amount of oil added to the CSD. **SOF ¶¶56–57**.

If, as the records indicate, the CSD was using oil excessively, the failure to repair or replace the defective part is the most likely cause of the engine fire warning that manifested on the date of the incident and caused the emergency. **SOF ¶58**. Therefore, based on the evidence in Allegiant's records, it is more likely than not that the incident was caused by a CSD/generator overheat because of a defective part that was improperly lubricated. **SOF ¶59**.

According to Mr. Swope's unrebutted testimony, Allegiant was negligent in that it failed to use ordinary care in the maintenance of the aircraft. **SOF ¶60**. That negligence proximately caused the right engine fire warning event, which led to the emergency landing. **SOF ¶61**.

Apparently, in addition to the above-mentioned instances of CSD oil and overheating issues, Allegiant had previously experienced CSD oil and overheating issues

on this unit when the right engine on the incident aircraft had been installed on another of Allegiant's aircraft in the left engine position. **SOF ¶62**.

In his 45 years as an aircraft mechanic, which included 35 years as an FAA airworthiness safety inspector and 14 years as a Principal Maintenance Inspector for a commercial airline, Mr. Swope observed that he has never seen so many CSD failures, let alone on one or two aircraft, as Allegiant's records reflect. **SOF ¶63**. In Mr. Swope's opinion, Allegiant's maintenance practices and procedures were clearly inadequate to assure the reliable operation of the CSDs and generators on its aircraft. **SOF ¶64**.

Allegiant's records show that the CSDs on the subject aircraft required service multiple times in the months preceding the incident on July 25, 2010, and that there were warnings that the right CSD and generator were failing. **SOF ¶72**. For example, Allegiant's records show that the right CSD sustained an overtemperature event on March 16, 2010 and again on March 18, 2010. **SOF ¶73**. On June 22, 2010, there was a report that the airplane had vibration aft of row 30 during the entire flight, and the pilots alternately shut down hydraulics and reduced power to idle alternately on each engine, with the other engine at normal power on descent, all of which had no effect on the vibration. **SOF ¶74**. On June 23, 2010, there was another report of vibration in aft cabin during flight, again requiring mechanics to perform an engine vibration check. **SOF ¶75**. And, on June 26, 2010—less than one month before this incident—there were two write-ups regarding right engine idle anomalies during taxi. **SOF ¶76**.

In Mr. Swope's professional opinion, within a reasonable degree of probability in the field of aircraft maintenance, the events and conditions described in the foregoing paragraphs were all warnings that the right CSD and A/C generator were failing. **SOF**

**¶77**. In Mr. Swope's professional opinion, it is more likely than not that the CSD/generator overheat was the cause of or a contributing factor to the right engine fire warning on the day of the incident. **SOF ¶78**.

After reviewing the report prepared by Mr. Swope and deposing him on August 19th and 20th of this year, Allegiant declined to produce its late-designated—and only—expert witness on liability, employee Kurt Carpenter, for deposition, electing instead to de-designate Mr. Carpenter as its rebuttal expert witness. **SOF ¶82**.

Mr. Swope also noted that the aircraft was not airworthy per Federal Aviation Regulations because the emergency slides were not installed, maintained and inspected to ensure that they would deploy properly. **SOF ¶65**. If the aircraft had been checked as required by its "Service Check" checklist, the unairworthy condition of the slides should have been discovered before the incident. **SOF ¶68**. This checklist specifically includes the following checklist item: "Check condition and security of…evacuation slides." **SOF ¶68**. The Aircraft Work Order stating that the foregoing check had been done on July 23, 2010—just two days before the emergency evacuation event in which *none* of the slides deployed properly—did not note the discrepancies that resulted in the failure of the slides to properly deploy on July 25, 2010. **SOF ¶70**.

In addition, one of the passenger seats was positioned in a way that prevented the over-wing emergency door from opening. **SOF ¶66**. This was an obvious discrepancy that should have been noticed by Allegiant personnel on a daily basis because it interfered with emergency exit procedures explained at the onset of every flight and rendered the aircraft unairworthy and unsafe. **SOF ¶67**.

According to Mr. Swope, the failure to identify these obvious discrepancies indicates that Allegiant's record keeping, maintenance and inspection practices are not accurate or reliable. **SOF ¶71**.

Mr. Swope's unrebutted testimony is that Allegiant's habit and routine practice of Allegiant with regard to maintenance of its aircraft is to sign off discrepancies as "no trouble found" and to send the aircraft out with the same discrepancy; use poor troubleshooting techniques; and employ poor maintenance practices. **SOF ¶¶83–85**.

Mr. Swope noted that, if not for the in-flight engine fire indication in the cockpit resulting from Allegiant's negligent maintenance practices, there would have been no need for an emergency landing. **SOF ¶86**.

Based on his review of Allegiant's records and the other evidence adduced in this case, Mr. Swope testified that the aircraft was unairworthy on the date of the incident and, therefore, should never have been flown in the first place. **SOF ¶¶80–81**.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). When the non-moving party bears the burden of proof on an issue at trial, the moving party must either show that the non-moving party has no evidence to support its case, or present affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial. *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994).

Once the party seeking summary judgment has provided the court with viable grounds for the granting its motion, the non-moving party must demonstrate to the court why summary judgment is inappropriate on the relevant facts or applicable law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir. 1993). When deciding a motion for summary judgment, a court's role is not to weigh the evidence or determine the "truth of the matter," but rather only to determine whether a genuine issue exists for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In this process, the court is required to view the evidence presented in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Litigants are entitled to a trial where there is the slightest doubt as to essential facts. *Wisener v. State*, 598 P.2d 511, 512 (Ariz. 1979).

### III. ARGUMENT & AUTHORITIES

**A. There is sufficient evidence to raise a genuine issue of fact as to whether Allegiant negligently maintained the emergency slides and exits, thereby rendering the aircraft unairworthy, endangering the evacuation process, and increasing the probability of injury to Desch.**

Allegiant contends that "the facts are simple and uncontested" in that there is no evidence that Allegiant breached any standard of care in relation to the evacuation of the aircraft.[2] The summary judgment record submitted by Desch establishes otherwise.

According to unrebutted[3] expert testimony, not a single one of the emergency exit slides, which are designed to automatically deploy and inflate, functioned as it was

---

[2] *See* Defendant Allegiant Air, LLC's Motion for Summary Judgment ("Allegiant's Motion") at p. 6 at ¶3; p. 7 at ¶1.

-10-

designed to. **SOF ¶¶3–4**. In fact, one of the slides could not be deployed at all because the slide pack fell backwards *into the cabin*. **SOF ¶5**.

The failure of the slides to deploy under emergency conditions required the flight attendants to spend time manually inflating them even as passengers crowded into the aisle and tried to make their way towards the aircraft's exits. **SOF ¶6**. Where the slide pack failed to deploy at all, passengers were forced find another exit out of the aircraft altogether. **SOF ¶7**.

One of the passengers, Mr. Nathaniel Odle, who was seated in an emergency exit row, reported that when he released the emergency door lock, he was not even able to open the door because the seats themselves were positioned in a way that actually *prevented the emergency door from opening*. **SOF ¶8**. According to Mr. Odle, "this caused panic" among the passengers. **SOF ¶9**.

Mr. Odle went on to describe the evacuation process as follows: "People all around me were frantic and in a panic trying to exit the plane. The fact that the emergency exit door next to me was partially blocked by the seats made it at first impossible to open and wasted precious time before it would open. This caused increased panic in the evacuation process." **SOF ¶10**.

At one point, a pile-up of people occurred at the bottom of one of the slides when an elderly lady who had slid onto the tarmac was struck by another person. **SOF ¶18**. As it turns out, multiple passengers other than Desch, who was still recovering from surgery,

---

[3] After reviewing the report prepared by Mr. Swope and deposing him on August 19th and 20th of this year, Allegiant declined to produce its late-designated—and only—expert witness on liability, employee Kurt Carpenter, for deposition, electing instead to de-designate Mr. Carpenter as its rebuttal expert witness. **SOF ¶82**.

-11-

sustained injuries as a result of using the evacuation slides. **SOF ¶19**. In fact, at least four passengers were transported to Flagstaff Medical Center for injuries "that required more treatment than they were able to provide on the field." **SOF ¶¶20–22**.

Unrebutted expert testimony establishes that the aircraft was not airworthy per Federal Aviation Regulations because the emergency slides were not installed, maintained and inspected to ensure that they would deploy properly. **SOF ¶65**. If the aircraft had been checked as required by its "Service Check" checklist, the unairworthy condition of the slides should have been discovered before the incident. **SOF ¶68**. This checklist specifically includes the following checklist item: "Check condition and security of … evacuation slides." **SOF ¶68**. The Aircraft Work Order stating that the foregoing check had been done on July 23, 2010 is less than credible to the extent that it failed to note discrepancies that resulted in the failure of every single slide on the aircraft to deploy as designed or deploy at all just two days later on July 25, 2010. **SOF ¶70**.

The fact that one of the passenger seats on the emergency exit row was positioned in a way that actually *prevented* the over-wing emergency door from opening in an emergency situation is further evidence of Allegiant's negligent approach to maintenance and flight safety. **SOF ¶66**. This discrepancy is so obvious that it is inconceivable that Allegiant's personnel failed to notice it, considering that emergency exit procedures must be explained at the outset of every flight. **SOF ¶67**. This condition, too, rendered the aircraft unairworthy and unsafe. *Id.*

Reasonable inferences from such summary judgment evidence are that Allegiant was negligent in its maintenance of the emergency slides and emergency exits on the aircraft, that Allegiant's negligent maintenance practices rendered the aircraft

unairworthy and unsafe and that use of Allegiant's emergency slides can and did cause injury to passengers other than Desch, establishing that injury caused by use of an emergency slide is entirely foreseeable and, therefore, the forced evacuation of passengers via emergency slides for an emergency situation created solely by a defendant's negligent maintenance is a breach of the standard of care under the objective, reasonable person standard of Arizona negligence law. *Nuñez v. Prof'l Transit Mgmt. of Tuscon, Inc.*, 271 P.3d 1104, 1109 (Ariz. 2012).

**B.   There is sufficient evidence to establish a genuine issue of fact as to whether Allegiant negligently maintained the aircraft, creating an utterly avoidable emergency situation that put Desch—and others—at risk for injury.**

According to expert testimony and other evidence submitted for consideration by the Court, the origin of the fire or overheating indication in the cockpit was most likely the Constant Speed Drive (CSD) on the right engine of the aircraft or the alternating current (AC) generator to which it is connected. **SOF ¶42; 63**. For example, the Flagstaff airport fire department reported that when it opened the cowling on the right engine, it observed that the generator[4] had suffered a catastrophic failure. **SOF ¶43**. Further, a review of the aircraft's maintenance records reflect that, more likely than not, there was an excessive oil consumption in the CSD that Allegiant serviced by merely adding oil instead of properly repairing or replacing the malfunctioning part. **SOF ¶44**.

---

[4]   Although Allegiant sent the engine for post-incident examination to a test facility called TIMCO to conduct a failure analysis, it removed the CSD and generator before shipping the engine, so TIMCO never had an opportunity to examine either the CSD or the generator. **SOF ¶¶46–47**. TIMCO's report consequently fails to identify the cause of the in-flight engine fire condition warning light in the cockpit. **SOF ¶¶48–49**.

-13-

Poor maintenance of the CSD/generator is indicated by virtue of the fact that Allegiant's records reflect an abnormally large number of instances of overheating of the CSD requiring oil servicing. **SOF ¶53**. The overheating events in Allegiant's logs are evidence of the unit using oil. **SOF ¶54**. Proper maintenance procedures for Allegiant's reliability program should have included a requirement that the amount of oil added be recorded. **[SOF ¶55]** Allegiant's records do not even contain a block for indicating the amount of oil added in the maintenance and flight log nor does it appear to have a procedure to record the amount of oil added to the CSD. **SOF ¶¶56–57**. Allegiant's records show that the CSDs on the subject aircraft required service multiple times in the months preceding the incident on July 25, 2010, and that there were warnings that the right CSD and generator were failing. **SOF ¶72**.

According to unrebutted expert testimony, if, as the records indicate, the CSD was using oil excessively, the failure to repair or replace the defective part is the most likely cause of the engine fire warning that manifested on the date of the incident and caused the emergency.[5] **SOF ¶58**. The events and conditions described in the foregoing paragraphs were all warnings that the right CSD and A/C generator were failing. **SOF ¶77**. Therefore, based on the evidence in Allegiant's records, it is more likely than not that the incident was caused by a CSD/generator overheat because of a defective part that was improperly lubricated. **SOF ¶59**.

---

[5] Moreover, in addition to the above-mentioned instances of CSD oil and overheating issues, apparently Allegiant had previously experienced CSD oil and overheating issues on this unit when the right engine on the incident aircraft had been installed on another one of Allegiant's aircraft in the left engine position. **SOF ¶62**.

-14-

According to unrebutted expert testimony, Allegiant was negligent in that it failed to use ordinary care in the maintenance of the aircraft. **SOF ¶60**. Adding oil without addressing the underlying defective condition of the CSD would constitute negligence in the maintenance of a commercial aircraft. **SOF ¶45**. That negligence caused the right engine fire warning event, which produced an otherwise avoidable emergency necessitating an emergency landing. **SOF ¶61**.

Reasonable inferences from the foregoing summary judgment evidence are that Allegiant was negligent in its maintenance of the CSD/generator, that Allegiant's negligent maintenance practices rendered the aircraft unairworthy and unsafe and that Allegiant's negligence created an otherwise avoidable emergency situation, requiring an emergency landing and evacuation that could foreseeably cause injury to passengers such as Desch, among others. Such negligent conduct by Allegiant would be considered by an objective, reasonable person to be a breach of the standard of care owed to its passengers. *See Nuñez*, 271 P.3d at 1109.

**C. Under Arizona law, Allegiant's negligence would be considered to have proximately caused Desch's injury.**

Allegiant argues that, even if it did negligently maintain the engine and even if this negligent maintenance forced the aircraft to make an otherwise avoidable emergency landing, which then necessitated an emergency evacuation of all passengers—including one who was only recently healing from an extremely delicate surgery—onto slides intended to be used only when a normal landing and normal disembarkation is not possible, these acts of negligence only establish "cause in fact" and do not prove

-15-

proximate cause.[6] According to Allegiant, its negligent maintenance of the aircraft is simply "too attenuated" from the sequence of events that led to Desch's injury to render it liable for those injuries.[7] The Court should summarily reject Allegiant's analysis, however, because it misconstrues Arizona substantive law defining and interpreting "proximate cause."

The elements of actionable negligence are a duty owed to the plaintiff by the defendant, a breach of that duty by the defendant and injury to the plaintiff proximately caused by the defendant's breach. *Wisener v. State*, 598 P.2d 511, 513–14 (Ariz. 1979) (citing *Boyle v. City of Phoenix*, 563 P.2d 905 (1977)). In establishing causation, a plaintiff must adduce evidence that "affords a reasonable basis for the conclusion that it is more likely than not that defendant's conduct was a substantial factor in bringing about the result." *Id.* (citing *Purcell v. Zimbelman*, 500 P.2d 335 (1972)). Proximate cause is most simply defined as that cause without which the injury would not have happened. *Ariz. State Hwy Dep't v. Bechtold*, 460 P.2d 179, 183 (Ariz. 1969).

"Circumstantial evidence, expert testimony, or common knowledge may provide a basis from which the causal sequence may be inferred … Such questions are peculiarly for the jury … (and) are questions on which a court can seldom rule as a matter of law. And whether the defendant's negligence consists of the violation of some statutory safety regulation, or the breach of a plain common law duty of care, the court can scarcely

---

[6] *See* Allegiant's Motion at p. 12, ¶1.
[7] *Id.* at ¶2. Allegiant also astonishingly contends that, even if Desch bounced off the end of the slide as a result of a defect in the slide itself, it cannot be held liable for that defect "because [Allegiant] did not cause [Desch] to bounce off the slide; thus the fault must lie either with [Desch's] improper use of the slide or with the slide itself."

-16-

overlook the fact that the injury which has in fact occurred is precisely the sort of thing that proper care on the part of the defendant would be intended to prevent, and accordingly allow a certain liberality to the jury in drawing its conclusion." *Wisener*, 598 P.2d at 513 (quoting W. Prosser, LAW OF TORTS § 41, 242–43 (4th ed. 1971)).

But for Allegiant's negligence in maintaining the CSD and generator on the right engine of the aircraft, an emergency landing and evacuation on emergency slides that carried their own inherent risk for injury would have not been necessary. But for Allegiant's negligence, which created an emergency situation and endangered the lives of all passengers aboard flight number 645, John Desch could have safely disembarked from the aircraft on a jetway without incident.

### IV. CONCLUSION

Because Desch has adduced more than sufficient competent summary judgment evidence with this response to support his claims that (1) Allegiant negligently performed the aircraft evacuation during which Desch was injured, (2) Allegiant negligently maintained the constant speed drive ("CSD") and generator connected to the aircraft's right engine, and (3) Allegiant's negligence in these respects not only put all of those aboard at risk, but was the proximate cause of Desch's injury, the Court should deny Allegiant's Motion for Summary Judgment in its entirety.

DATED this 30th day of October, 2014.

Respectfully submitted,

By: */s/ Paula K. Knippa*
Mark D. Pierce
Paula K. Knippa
S<small>LACK</small> & D<small>AVIS</small>, LLP
2705 Bee Cave Road, Suite 220
Austin, Texas 78746
Telephone: (512) 795-8686
mpierce@slackdavis.com
pknippa@slackdavis.com

Thomas A. Burnett, Esq.
Burnett Law Office, PLC
1744 South Val Vista Drive, Suite 208
Mesa, AZ 85204
(480) 347-9116
tom.burnett@burnettlawaz.com

***Attorneys for Plaintiff John Desch***

## C<small>ERTIFICATE OF</small> S<small>ERVICE</small>

I certify that on the 30th day of October, 2014, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electric Filing to the CM/ECF registrants:

Kevin D. Neal
Kimberly G. Allen
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, AZ 85016
*Attorneys for Defendant Allegiant Air, LLC*

*s/ Paula K. Knippa*
Paula K. Knippa