# EXHIBIT A

Thomas A. Burnett, Esq. (#026509)
BURNETT LAW OFFICE, PLC
1744 South Val Vista Drive, Suite 208
Mesa, AZ 85204
(480) 347-9116
tom.burnett@burnettlawaz.com
*Attorneys for Plaintiff*

RECEIVED
MAY 20 2014
GALLAGHER & KENNEDY

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| JOHN DESCH, a married individual;<br>Plaintiff,<br>v.<br>ALLEGIANT AIR, LLC, a Nevada Corporation; JOHN and JANE DOE I-X; and ABC COMPANIES I-X;<br>Defendants. | **NO: 12-CV-02504-FJM**<br>**PLAINTIFF'S FOURTH SUPPLEMENTAL RULE 26 DISCLOSURE STATEMENT**<br>**(Supplements in Bold)** |

Plaintiff, John Desch, by and through undersigned counsel submits this third supplemental disclosure statement pursuant to Rule 26 of the *Federal Rules of Civil Procedure*. Pursuant to *Fed. R. Civ. P. 26(e)*, Plaintiff reserves his right to supplement the disclosures made herein as discovery and Plaintiff's investigation progress. **(Supplements in Bold)**

I. WITNESSES

1. John Desch
c/o Burnett Law Office, PLC
1744 South Val Vista Drive, Suite 208
Mesa, AZ 85204

It is anticipated that Mr. Desch will testify regarding the injuries he sustained as a result of the accident, his recollection of the accident, the events that took place on the

Report# IWP192010021 as well as their personal knowledge or gathered knowledge concerning the events leading up to the incident, the events post-incident, and the investigation into the incident.

14. Plaintiff may also call any witness listed by Defendants or other Plaintiffs.

15. Nathaniel Odle, 808 West Spokane Falls Boulevard, Spokane, WA 99201, was a passenger on the subject flight and will testify as to any conversations he may have had with Defendant's agents, employees, or representatives, other passengers, investigating officers, and emergency personnel, regarding the events leading up to and preceding the incident. He is also expected to testify consistent with matters contained in his affidavit.

16. **Todd Doerr, M.D.**
**Spine & Orthopedic Specialists**
**20401 North 73rd Street, Suite 175**
**Scottsdale, AZ 85255**

**Dr. Doerr's C.V. is attached hereto. Dr. Doerr has been retained as Plaintiff's orthopedic expert. It is expected that Dr. Doerr will testify consistent with matters, his opinions, and information contained in his report.**

**17. Leonard Swope**
**Expert Aviation Consulting, LLC**
**7915 South Emerson Avenue, Suite 192**
**Indianapolis, IN 46237-9708**
**(877) 480-8774**

**Mr. Swope's C.V. is attached hereto. Mr. Leonard Swope is an Aviation Consultant Expert and formerly an Aviation Safety Inspector at FAA. It is**

**anticipated that Mr. Swope will testify consistent with matters, his opinions and information contained in his report.**

II. LIABILITY

Defendant, Allegiant owed its passengers, including Plaintiff, a non-delegable duty, as a common carrier, to use reasonable care under the circumstances to ensure the safety of all passengers aboard its Aircraft, which duty was breached by Defendant and/or their employees, agents and/or others for whom defendant is and was at all times material legally responsible. This duty applied to all passengers during flight and upon entry and exit, including evacuation, of the Aircraft.

Defendant, Allegiant, by and through its employees, agents, and assigns, negligently conducted an emergency evacuation process, caused undue panic and confusion, and was not properly supervised. Defendants' negligence was the actual and proximate cause of Plaintiff's accident and resulting injuries and damages.

Upon information and belief, Defendant negligently failed to properly inspect and maintain the Aircraft's emergency exits and slides to ensure the same would function properly in the event an emergency landing was required. As a result of some of the emergency slides malfunctioning in the subject incident, it caused added panic, confusion, stress, and contributed to the negligently supervised evacuation. Defendant's negligence was the proximate cause of Plaintiff's accident and resulting injuries and damages.

Defendant, Allegiant, had a non-delegable duty to properly maintain and inspect its Aircraft to ensure the proper functioning of its components for the safety of its

# EXHIBIT B

Leonard F. Swope
4149 Stone Ridge Drive
Brownsburg, IN 46112
(317) 460-0408


John Desch v. Allegiant Air


Preliminary Expert Report

In compliance with Federal Rule of Civil Procedure Rule 26

Expertise: Aircraft maintenance and Federal Aviation Regulations


Aircraft Occurrence involving DC-9-83 / N880GA

Occurrence Flagstaff, AZ.

Date of occurrence July 25, 2010

**Documents and Items Reviewed:**

Aircraft log Book pages 170416 Thru 170421
Flight crew reports
Cabin crew reports
Parts History report for L-1 door slide PN D29982-107 S/N 0676
Parts History report for R-1 door Slide P/N D29982-107 S/N 2071
Parts history report for Tailcone Slide P/N D29984-119 S/N 0171
List of Maintenance personnel who worked on AC N880GA (not complete)
N863GA Slide discrepancies (wrong aircraft)
N863GA door discrepancies (wrong aircraft)
N863GA Slide function check report (wrong aircraft)
Pacific Gas Turbine Receiving and shipment inventory dated 8/27/2009.
Allegiant defect report 9/10/2009 thru 7/25/2010 for aircraft N880GA
Passenger cabin inspection cards.
Flagstaff, AZ, Fire department report
Flagstaff, AZ, Police department report.

**Qualifications:**

See attached Resume

**Factual Information:**

On July 25, 2010, Allegiant air flight 645, a DC 9-83, N880GA, from Billings Montana to Phoenix, Arizona. diverted to flagstaff, Arizona due to an engine fire warning indication.

A review of the supplied documentation showed that a failure in or on the number 2 engine (right engine) on aircraft N880GA was the cause of the diversion and subsequent emergency evacuation of passengers on the runway which resulted in injuries.

A review of the supplied documentation revealed insufficient data to determine the cause or extent of damage to the #2 engine.

Information on the engine, constant speed drive (CSD) and the generator are necessary to help determine the cause of the fire indication that resulted in the diversion and subsequent emergency evacuation of aircraft N880GA on flight 645.

The phoenix, AZ police report stated that the police officer observed "metal shavings on the cover and some other jagged metal pieces that were apparently broken".

The generator and constant speed drive are an integral part of the engine and therefore records and data pertaining to these items is necessary to help determine the cause of the fire warning and subsequent damage to the #2 engine.

In addition to issues surrounding the engine, generator and Constant Speed Drive, it is evident to me that there are maintenance issues in regard to the slide that failed to deploy and the remaining slides that failed to auto deploy.

Based on available information, It is more likely than not that Allegiant Air is negligent on the maintenance of this aircraft and that that lead to Mr. Desch's injuries.

Update: On may 19, 2014 at 4:21pm EST. I received 41 pages of documents to review. Preliminary investigation revealed numerous discrepancies on CSD's. I have requested 30 to 60 days of daily and or preflight inspections on this aircraft to help determine oil servicing on the respective CSD's. This information is critical and has not been provided. With only 4 hours to the deadline, I cannot adequately perform a detailed review of the material supplied.

**Supplementation of Opinions:**

I reserve the right to supplement the above report if additional information is provided to me after the date of this report.

**Compensation:**

My billable hourly rate is $225.00/hour. My rate for depositions and /or trial is $275/hour. All expenses are billed at actual cost. I receive no compensation based on the outcome of this case.

**Previous testimony during the past 4 years:**

I have not given testimony.

I have given a deposition in the Bernard Clarke v. Express JetAirlines, INC.

Leonard F. Swope

Dated May 19, 2014



7915 S. Emerson Ave, Suite 192 Indianapolis, IN 46237-9708



877-450-8774

## Leonard Swope

Leonard Swope graduated from Pittsburgh Institute of Aeronautics in 1968 with both an Airframe and Power plant certificate and went to work for Trans World Airlines in New York where he worked on the Boeing 707, 727 and 747 aircraft. Leonard took a short leave of absence for his tour in the military after being drafted in 1969. In the military Leonard was a Turbine Engine Specialist and an Instructor. After the military, Leonard returned to TWA in New York and stayed with TWA until December 1972.

On January 3, 1973 Leonard began work as an aircraft mechanic for the Federal Aviation Administration at Hangar 6 in Washington DC where he worked on the FAA's fleet of both general aviation and executive type aircraft.

In September of 1981, due to a reduction in force at the FAA, Leonard transferred to the Engine Shop at Davidson Army Airfield in Virginia where he worked on both fixed wing aircraft and helicopters. Due to having his Airframe and Power plant certificates, Leonard also worked airframe, the sheet metal shop, the prop and rotor shop and the paint shop.

In August 1984, Leonard accepted a position as an Aviation Maintenance Safety Inspector at the General Aviation District Office (GADO) in Indianapolis, IN. He started as a General Aviation Maintenance Inspector. He worked with general aviation faction and also worked with Repair Stations. He also worked with Fixed Base Operators performing annual facility inspections and fuel facility inspections. He also worked with the Fixed Base Operators on aircraft certification projects.

The Indianapolis General Aviation District Office (GADO) became a Flight Standards District Office (FSDO) and Leonard changed to an Air Carrier Maintenance Inspector.

Leonard worked his way up through the ranks from inspector to Principal Maintenance Inspector (PMI) for Britt Airways with their fleet of Swearingen SA226, Beechcraft 99 and Fairchild FH227 aircraft. Leonard was instrumental in the merger and transition of Britt Airways into Continental Express Airlines, which still exists today. Leonard then became the Principal Maintenance Inspector (PMI) for American Trans Air Airlines and helped them grow from a vacation airline to the 10th largest passenger-carrying airlines in the United States. Their fleet grew from 1 Boeing 707 to 24 Boeing 727-200 aircraft, 30 Boeing 757 aircraft, 14 Lockheed L-1011 aircraft and 30 some Boeing 737 series aircraft. After 20 years as a PMI, Leonard became the Supervisor of the Airworthiness Section at the Indianapolis FSDO and maintained that position until he retired in November 2010.

Leonard's duties as a PMI included approving and monitoring the aircraft maintenance and inspection programs for each fleet of aircraft including the Minimum Equipment List, Configuration Deviation List and time limitation list. Provided accident, incident and occurrence investigations. Assured compliance with the Federal Aviation Regulations. Worked with the air-carrier and the FAA aircraft certification office to put new production aircraft on the certificate. Worked with the air-carrier and FAA engineering for approval of minor and major changes to the aircraft, including changes to the seating configurations and adding new equipment. Worked with the air-carrier to approve and monitor their Reliability Program, the aging aircraft maintenance inspection program, and Reduced Vertical Separation Minimums (RVSM).

EDUCATION

Airframe and Power plant certification 1968

Associate degree in applied science 1975

MILITARY SERVICE

United States Army1969--1972

EMPLOYMENT HISTORY

Trans World Airlines – 1968—1972

Federal Aviation Administration - 1973—1982

Davidson Army Airfield - 1982---1984

Federal Aviation Administration 1984-2003. Principle Maintenance Inspector

Federal Aviation Administration 2003-2010. Airworthiness Unit Supervisor

AERONAUTICAL RATINGS

Airframe and Power-plant certificate, Class I Radio / Telephone license

FACTORY AIRCRAFT MAINTENANCE TRAINING

BOEING B-727, B-757; B-767:

B-737-600/700/800/900

LOCKHEED L-1011,

BELL-206L Helicopter

CESSNA- 400 Series, CITATION I, and II

EMBRAER EMB-120

Pratt & Whitney PT-6

MSG-3, Maintenance Steering Group

Member of the F.O.E.B board on the Swearingen SA226 and Lockheed L-1011 aircraft

WORK EXPERIENCE ON

Lockheed Jetstar

Cessna Citation I and II

Cessna 421
Cessna 150
Cessna 182
Beechcraft BE-99 King Air
Beechcraft BE-58 Barron
Beechcraft BE-35 Bonanza
McDonald Douglas DC-3
McDonald Douglas DC-9
Boeing 727 - 100 and 200 series
Boeing 707
Boeing 747
Piper PA-28-140
Bell Helicopter 206L
Military UH-1 Helicopter

I have also participated in numerous certification projects ranging from air-carrier certification to certification projects and conformity inspections for FAA Supplemental Type Certificates and FAA Type Certificate modifications.

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Dallas Lazzerini and David Lazzerini, ) Case No.
) CV12-1738-PHX-SPL
Plaintiffs, )
)
vs. )
)
Allegiant Air, LLC, )
)
Defendant. )
)

DEPOSITION OF LEONARD SWOPE
VOLUME II
(Pages 18 - 102)

Mesa, Arizona
August 20, 2014
8:00 a.m.

REPORTED BY:
LINDA BLACKMON, RPR/RMR
Certified Reporter
Certificate No. 50320

PREPARED FOR:
(Copy)

INDEX

| WITNESS | Page |
|---|---|
| LEONARD SWOPE | |
| Examination by Ms. Allen | 21, 99 |
| Examination by Mr. Pierce | 86 |

EXHIBITS

| Deposition Exhibits: | Description | Page |
|---|---|---|
| 1 | Disclosure Statement (Previously marked in Volume I) | 23 |
| 2 | Preliminary Expert Report (Previously marked in Volume I) | 23 |
| 3 | Service Check/Aircraft Work Orders | 54 |
| 4 | Service Check Records | 54 |
| 5 | Curriculum Vitae | 88 |
| 6 | Flagstaff Police Department Photographs | 89 |
| 7 | Program Tracking and Reporting Subsystem Data Sheets | 99 |

DEPOSITION OF LEONARD SWOPE, taken on August 20, 2014, commencing at 8:00 a.m., at The Burnett Law Office, 1744 South Val Vista Drive, Mesa, Arizona, before LINDA BLACKMON, RPR/RMR, a Certified Reporter in the State of Arizona.

COUNSEL APPEARING:
For the Plaintiffs:
Slack & Davis
By: MARK D. PIERCE, ESQ.
2705 Bee Cave Road, Suite 220
Austin, Texas 78746
and Burnett Law Office, PLC
By: THOMAS BURNETT, ESQ.
1744 South Val Vista Drive, Suite 208
Mesa, Arizona 85204

For the Defendant:
Gallagher & Kennedy
By: KIMBERLY G. ALLEN, ESQ.
2575 East Camelback Road
Phoenix, Arizona 85016

LEONARD SWOPE,
called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION (Continued)
BY MS. ALLEN:
Q. Mr. Swope, you've been retained by plaintiff in this case to provide an opinion regarding the maintenance of the aircraft, true?
MR. PIERCE: Objection; asked and answered.
MS. ALLEN: Are you instructing your witness not to answer?
MR. PIERCE: I have objected, asked and answered.
Q. BY MS. ALLEN: Who were you retained by?
A. I was retained by the defendant, Mr. Desch -- or, I'm sorry, by Mr. Pierce.
Q. And Mr. Pierce is the plaintiffs' counsel?
MR. PIERCE: If you know the difference between the plaintiff and defendant, feel free.
A. No, I'm not sure.
Q. BY MS. ALLEN: It is your understanding of the scope of your retention solely to provide an opinion regarding the maintenance of the aircraft, specifically



the CSD generator and slides, true?
MR. PIERCE: Objection; asked and answered.
Q. BY MS. ALLEN: You can go ahead and answer the question.
A. I have reviewed all of the data that has been supplied to me in relation to the maintenance, the maintenance department, the reliability program, and the maintenance as it pertains to the maintenance of the engine, the CSD, the engine-driven generator and the slides and the doors.
Q. Mr. Swope, these questions have been crafted so that you can answer a "yes" or "no" to the questions. If you cannot answer "yes" or "no," please let me know and I'll rephrase my question.
I again ask, it is your understanding that the scope of your retention is solely to provide an opinion regarding the maintenance of the aircraft, specifically the CSD, generator, engine and slides, yes?
A. Yes.
MR. PIERCE: Objection. Wait. Objection; asked and answered.
Q. BY MS. ALLEN: Okay. You have rendered opinions on both the maintenance of the slides and the maintenance of the engine-driven generator, yes?



A. Through the report, yes.
Q. These are the only topics you have been retained to render opinions on, yes?
MR. PIERCE: Objection; asked and answered.
Q. BY MS. ALLEN: You can go ahead.
A. Would you repeat the question?
Q. These are the only topics you have been retained to render opinions on, yes?
A. Well, there are other topics in there that would be referenced.
Q. I'd like to direct your attention to what we've marked as Exhibit 1. Have you seen this before? I avow to you that this is the disclosure statement that we showed you yesterday.
A. Yes.
Q. If you'd turn to Page 9, No. 17, moving over to page 10, at the bottom it says, "it is anticipated that Mr. Swope will testify consistent with matters, his opinions and information contained in his report." Is that what it says?
A. Yes.
Q. Your report, which we've marked as Exhibit 2, if we turn to Page 3 of your report, it states in addition to issues surrounding the engine, generator and



constant speed drive, you will also be providing an opinion as to maintenance issues in regards to the slide that failed; is that true?
A. Correct.
Q. Those are the only opinions that you will be offering in this case, true?
MR. PIERCE: Objection to the form. Objection; asked and answered.
Q. BY MS. ALLEN: These are the only opinions you will be offering in this case, true?
MR. PIERCE: Objection to the form. Object; asked and answered.
MR. ALLEN: Mr. Swope, your attorney will make objections, you still have to answer my question.
MR. PIERCE: And is there a question on the table?
THE WITNESS: Would you repeat?
Q. BY MS. ALLEN: You will only be providing opinions as to the maintenance of the engine, generator, constant speed drive and the slide that failed to deploy, true?
MR. PIERCE: Objection, form. Objection; asked and answered.
Q. BY MS. ALLEN: According to this report?
A. According to this report, yes.



Q. Again, this was the report that was produced with the disclosure statement on May 20th, 2014, true?
MR. PIERCE: Objection. That's incorrect. It was provided on May the 19th.
Q. BY MS. ALLEN: Provided May 19th, received on May 20, as it states on the stamp date. This is a report that was provided with this disclosure statement, true, on May 20th, which was when it was received by defendants?
A. True.
MR. PIERCE: If you can say that. If you know.
A. Well, that's what it's stamped, so I would assume that it's correct.
Q. BY MS. ALLEN: Have you reviewed your report before?
A. Yes.
Q. In your file is an amended report. When did you produce the amended report?
A. Boy, I would have to look at my records and see when the amended report was. I believe it was in June.
Q. Please go ahead and look at your records if you need to.
MR. PIERCE: I can help here if you want me to tell you?



THE WITNESS: Yes. Do you have it right off?
MR. PIERCE: I'm speaking to Counsel here.
Q. BY MS. ALLEN: I will state your billing records show that this report was produced to Mr. Burnett on May 30th; does that sound right?
A. That sounds about right.
Q. The report contains additional opinions not included in your report produced on May 19th, 2014, true?
A. That is correct.
Q. You understand the defendants did not receive this report until August 18th at roughly 5:00 p.m., true?
MR. PIERCE: Objection to form.
A. I have no knowledge of that. I submitted it.
Q. BY MS. ALLEN: Let's turn to Exhibit 2, your report. Your report states that there are maintenance issues in regards to the slide that failed to deploy and the remaining slides that failed to auto-deploy, true? Page 3, first paragraph.
A. Yes.
Q. According to this report, you base this opinion on your review of the aircraft logbook, flight crew

reports, cabin crew reports, slide histories for the L-1, R-1 and tailcone slide, cabin inspection report cards, the Flagstaff Fire Department report, and the police department report, true?
A. Correct.
Q. According to this report, your opinion states that it is evident to you that there are maintenance issues in regards to the slide that failed to deploy, true?
A. True.
Q. You are aware that Mr. Desch testified that he did not believe there was anything wrong with the slide he exited from, true?
A. I have no knowledge of that. I have no idea what Mr. Desch said.
Q. You have not reviewed Mr. Desch's deposition?
A. No, I have not. I have not received that, nor was I asked to review it.
Q. Per your report, you will not be offering an opinion on the slide Mr. Desch exited from, true?
A. I can't say that. I was looking at all of the slides. I don't know which slide Mr. Desch exited.
Q. So you're not aware that Mr. Desch exited from the R-1 slide, true?
A. I was not aware of that, no.

Q. You are aware that the R-1 slide deployed properly, true?
A. That is incorrect.
Q. So the R-1 slide, in your opinion, did not deploy properly?
A. That is correct.
Q. Your opinion would not change if you knew the R-1 slide deployed properly, true?
A. I can't say that. Based on the information that I have, the R-1 door slide did not deploy properly.
Q. You have never inspected the slides at issue on this aircraft, true?
A. That is correct.
Q. Your opinion states that the plane Mr. Desch was on was a DC-9, true?
A. That was the information that was in the report that I received.
Q. You are aware that the plane Mr. Desch was on was actually an MD-83, true?
A. I have no knowledge of that. All I have was the information that was supplied to me by review, and that came in the form of the report that identified the aircraft as what I identified it as.
Q. So you are not aware that the plane Mr. Desch was on was actually an MD-83?

A. As I said, I identified the aircraft that was identified in the report that I received.
Q. What report did you receive? You're pointing to the disclosure statement.
A. No. The --
Q. To help you out, I'll direct your attention to Customer Engine Event Removal Information produced by Pratt & Whitney on July 28th, 2010. The aircraft type states MD-83. Do you see that?
A. Yes.
Q. You are aware that the DC-9 and the MD-83 are different models of aircraft, true?
A. True.
Q. Your opinion does not change with the knowledge that Mr. Desch was on a different model plane from the one you offered an opinion about, true?
A. True.
Q. To be clear, you were not on board Flight No. 645 on July 25th, 2010, true?
A. That is correct.
Q. You have never been a flight attendant, true?
A. That is correct.
Q. You have never been on board a flight during an emergency landing, true?
A. That is true.



Q. You have never been on board a flight when emergency slides have been deployed, true?
A. On a flight, no.
Q. That's not true or that is true? Let me reask.
A. Please rephrase the question.
Q. You have never been on board a flight when emergency slides have been deployed, true?
A. True.
Q. You have never tried to deploy the slides on the MD-83 aircraft, true?
A. True.
Q. You are not a slide maintenance technician, true?
A. Part of my duties as an FAA safety inspector is to review and analyze emergency escape slides.
Q. That was not my question. You are not a slide maintenance technician, true?
A. Correct.
Q. You have never performed maintenance on an MD-83 aircraft, true?
A. True.
Q. Now, according to your CV, you have never testified in court before, true?
A. That is correct.

Q. You also have never been qualified in District Court to render an opinion concerning the maintenance of evacuation slides, true?
A. True.
Q. You have never spoken with the flight attendants or flight crew from Flight No. 645, true?
A. True.
Q. You've never reviewed the deposition testimony of any of the flight crew or flight attendants on board --
A. I have their written reports, their written statements, but not their deposition.
Q. Mr. Swope, please let me finish my question before answering.
You have never reviewed the deposition testimony of the flight attendants or flight crew on board Flight No. 645 on July 25th, 2010, true?
A. True.
Q. You will not be offering an opinion regarding the conduct of the flight crew on board Flight No. 645 on July 25th, 2010, true?
A. Please repeat the question.
Q. You will not be offering an opinion regarding the conduct of the flight crew on board Flight No. 645 on July 25th, 2010, true?

A. True.
Q. You will not be offering an opinion as to the conduct of Mr. Desch on the plane during the evacuation, true?
A. True. I have never spoken to Mr. Desch or have any knowledge of any of the occurrences that happened involving Mr. Desch himself.
Q. You will not be offering an opinion as to how Mr. Desch exited the plane, true?
A. True.
Q. Exhibit 2, your report, states you have reviewed the history reports for the L-1 door slide, R-1 door slide and tailcone slide, true?
A. True.
Q. You would agree with me that those history reports do not show any evidence of maintenance issues with those slides, true?
A. I can't say that. I reviewed the history, it didn't give the actual serial numbers. There was a lot of maintenance issues regarding slides. I don't know if any one of them pertained to those slides by serial number.
Q. You have been retained to offer an opinion on the slides on board Flight No. 645 on July 25th, 2010, true?

A. True.
Q. You have reviewed the history reports for the L-1 door slide, R-1 door slide and the tailcone slide on board Flight 645 on July 25th, 2010, true?
A. True.
Q. Those reports show no evidence of any maintenance issues with those slides on board Flight No. 645 on July 25th, 2010, true?
A. Those reports don't reflect the slides as of that date. Those slides did fail to function as proper.
Now, that may not have been the issue or may not have been discovered or in the report because it didn't happen until the day of the flight.
Q. It is your opinion that all slides on the plane on Flight No. 645 on July 25th, 2010 failed to work properly?
A. That is correct. And that thereby rendered the aircraft in an unairworthy condition because they failed to perform their intended function.
Q. Every slide on that plane failed --
A. Every slide on that plane --
Q. I'm sorry. Let me finish my question. It is your opinion that every slide on board Flight No. 645 on July 25th, 2010, did not function properly?



A. That is correct.
Q. And it does not change your opinion if you knew the R-1 slide deployed properly, true?
A. True.
Q. I direct your attention to Page 16 of Mr. Desch's deposition, lines 6 through 13.
(Witness reviews document.)
Q. BY MS. ALLEN: According to Mr. Desch's deposition testimony, "the first time you heard about an emergency evacuation was after the plane had landed and come to a complete stop," true?
A. That's what it says in the deposition, yes.
Q. And you have no evidence to suggest otherwise, true?
A. True.
Q. So you would agree with me Mr. Desch testified he did not know an emergency landing was taking place until after the plane touched down on the tarmac in Flagstaff, true?
A. That's what he said.
Q. Your report attached to the Fourth Supplemental Disclosure received on May 20th, produced on May 19th, states that you are providing an opinion regarding the maintenance of the engine, generator and constant speed drive.

You have not spoken with anyone regarding the maintenance of the engine, generator and constant speed drive, true?
A. That is correct.
Q. You have not spoken with any FAA, NTSB, police or firefighters who investigated this incident, true?
A. I have not spoken to anyone personally, no.
Q. You have been provided records from TIMCO, the shop that analyzed the engine-driven generator, following the emergency evacuation on July 25th, 2010, true?
A. Repeat the question.
Q. You have been provided records from TIMCO, T-I-M-C-O, the shop that analyzed the engine-driven generator, following the emergency evacuation on July 25th, 2010, true?
A. No, I have not received any information regarding the generator itself. That was information we had requested, but I have not received it.
Q. Included in the file that I received on August 17th at 4:57 p.m., which was your file, this was included in it. Have you seen that report before?
A. Yes.
Q. This report is the TIMCO Aviation Services preliminary tear-down report, true?

A. This one, yes.
Q. The TIMCO report did not evidence any problems with the engine-driven generator, true?
A. I'm not even sure the generator was submitted with the engine.
Q. According to that report, there are no statements concerning the engine-driven generator, true?
A. No.
Q. No, not true?
A. No, there's nothing in here referencing the engine-driven generator. Just a minute.
There is nothing on here because the CSD was not installed when the aircraft was received for the preliminary report, so the generator would not have been with the engine when it went in.
Q. It is your opinion that the CSD was not with the engine during the tear-down of the engine?
A. That's what it says on the report. If you take a look on the back there, I can show you. It says, "CSD not installed," so it was not on the engine when it went to TIMCO.
Q. Again, according to this report, there's no statements concerning the engine-driven generator on the preliminary tear-down report, true?
A. Correct, because it was not with the aircraft

or engine.
Q. Mr. Swope --
A. There can't be -- there can't be a report on it if it was not submitted with the engine.
Q. Mr. Swope, I understand, but please answer the question that's asked. If you cannot answer the question with a "yes" or "no," please let me know and I will rephrase. Understand?
A. Okay. Would you rephrase the question.
Q. That's okay. You just answered it. That's fine.
A. Okay.
Q. I'm saying going forward, and I've asked you three times now.
You have not reviewed any documentation evidencing any findings of issues with the engine-driven generator on board Flight No. 645 on July 25th, 2010, true?
A. Would you repeat the question.
Q. You have not reviewed any documentary evidence from Flight No. 645 on July 25th, 2010, evidencing any problems with the engine-driven generator, true?
A. I'm not sure how to respond to that. I've got a lot of data that I've reviewed, and there is nothing that I reviewed that indicated there was a problem with



Discrepancy/Request area and Corrective Action area, true?
A. It does.
Q. Under Corrective Action it states -- I'm sorry. I'm looking at the one dated June 1st, 2010. The first one.
A. Okay.
Q. It states, "C/W service check, IAW SVC check task card," true?
A. Uh-huh. Yes, it does.
Q. That indicates that a service check was performed, true?
A. Yes.
Q. There are no Discrepancy/Request listed next to that, true?
A. That is true.
Q. Turning to June 3rd, 2010, again, this is a service check record, true?
A. True.
Q. Under Corrective Action it states, "C/W service check task card," true?
A. True.
Q. There are no Discrepancies/Requests located next to the service check task card, true?
A. True.

Q. On June 6th, 2010, under Corrective Action it states, "C/W service check," true?
A. True.
Q. Again, this indicates that a service check was performed, true?
A. True.
Q. And under Discrepancy/Request there is nothing there, true?
A. True.
Q. On June 9th, 2010, under Corrective Action it states, "C/W service check," true?
A. True.
Q. This indicates a service check was performed, true?
A. True.
Q. Under Discrepancy/Request there is nothing located there, true?
A. True.
Q. On June 13th, 2010, under Corrective Action it states, "C/W service check," true?
A. True.
Q. That indicates a service check was performed, true?
A. True.
Q. And under Discrepancy/Request there is nothing

written, true?
A. True.
Q. On June 15th, 2010, under Corrective Action it states, "C/W service check," true?
A. True.
Q. A service check was performed on June 15th, 2010, true?
A. True.
Q. Under Discrepancy/Request nothing was found, true?
A. True.
Q. On June 18th, 2010, it states, "C/W service check," true?
A. True.
Q. A service check was performed on June 18th, 2010, true?
A. True.
Q. And nothing was found, true?
A. True.
Q. On June 21st, 2010, it states, "C/W service check per task card." This indicates a service check was performed, true?
A. You're on what?
Q. June 21st, 2010.
A. Okay. And it says what?

Q. "Service check per task card," true?
A. Mine just says, "Comply with service check."
Q. "C/W service check." I'm sorry. June 21st, 2010.
A. Yes. June 21st, 2010, mine says, "Comply with service check," period.
Q. Okay. And C/W means comply with service check, just for clarification.
A. Yes.
Q. And nothing was found, true?
A. True.
Q. June 24th, 2010, "service check complied with per service check task card," true?
A. True.
Q. And nothing was found, true?
A. True.
Q. June 27th, 2010, states, "Service check complied with IAW service check task cards," true?
A. What date are you on?
Q. June 27th, 2010, at the bottom.
A. Yes. But I don't have IAW. I have "Service check complied with per service check task card."
Q. Okay. Can I see what you have?
Oh, we're looking at the wrong one. You're looking at June 24th, I was looking at June



27th. So on June 27th, at the bottom, "service check complied with IAW service check task card," true?
A. True.
Q. And nothing was found on that date, true?
A. True.
Q. On June 30th, 2010, it states, "complied with service check per task card," true?
A. True.
Q. And nothing was found, true?
A. True.
Q. On July 4th, 2010, the service record states, "service check complied with" --
A. What date?
Q. July 4th, 2010.
A. I don't have one dated July 4th. I have one dated July 3rd.
Q. I'm sorry. We're looking at the -- where it states Origination Information at the top of the page.
A. Oh, I'm looking at the Closing Information, which is what you directed me to earlier.
Q. Thank you. I'm sorry. Look at July 6th, 2010, under Closing Information.
A. July?
Q. July 6th --
A. 6th.

Q. -- 2010.
A. Okay.
Q. On that service check record it states, "service check complied with IAW service check task card," true?
A. Correct.
Q. No discrepancy was found, true?
A. Correct.
Q. On July 8th, 2010, it states, "service check complied with per service check task card," true?
A. True.
Q. No discrepancies were found, true?
A. True.
Q. On July 11th, 2010, the service check record states, "service check complied with per task card." No discrepancies were found, true?
A. True.
Q. On July 14th, 2010, it states, "service check complied with IAW service check task card," true?
A. True.
Q. No discrepancies were found, true?
A. True.
Q. On July 17th, 2010, it states, "complied with service check per task card," true?
A. True.

Q. No discrepancies were found, true?
A. True.
Q. On July 20th, 2010, it states, "service check complied with IAW service check task card," true?
A. True.
Q. No discrepancies were found, true?
A. True.
Q. On July 23rd, 2010, the service check record states, "complied with service check IAW task card," true?
A. True.
Q. No discrepancies were found, true?
A. True.
Q. It is your understanding that these service records are the records showing service checks were performed for the 30 days prior to the accident, true?
A. It's the service records that shows they were performed, but it looks like they've been pencil whipped because it's inconceivable to think that you could go 19 service checks and not have a single discrepancy on that airplane.
Q. So --
A. More likely than not, had they performed these service checks correctly and really looked at the aircraft, there would have been multiple discrepancies,

which would have -- they would more than likely have found evidence that there was something wrong.
Q. Mr. Swope, these service check records do not indicate any discrepancies with the aircraft for the 30 days prior to the emergency evacuation on July 25th, 2010, true?
A. There is nothing listed here. It's just inconceivable that you could have that many service checks and not have a single discrepancy on the airplane.
Q. Mr. Swope, please answer the question that was asked. I'm not asking you to expound. If I need more information, I will ask it of you. Do you understand?
MR. PIERCE: He's answering your question.
A. I'm answering --
Q. BY MS. ALLEN: Mr. Swope --
A. -- the best I can. Yes, this does indicate that the service checks were completed, and based on the information here there were no discrepancies found.
Q. And you have not reviewed any documentary evidence for the 30 days prior to the emergency evacuation on July 25th, 2010, evidencing any discrepancies with the aircraft, true?
A. True.
MR. PIERCE: Because you haven't produced

