# EXHIBIT A

Kevin D. Neal, Bar #011640
Liana J. Garcia, Bar #027452
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
Telephone: (602) 263-1700
Fax: (602) 200-7851
kneal@jshfirm.com
lgarcia@jshfirm.com

Attorneys for Defendant Allegiant Air, Ana Vindas and Jeffrey Tucker

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| John Desch,<br><br>Plaintiffs,<br><br>v.<br><br>Allegiant Air, LLC, a Nevada corporation; Ana Vindas, pilot; Jeffrey Tucker and Jane Doe Tucker, co-pilot; AAR Corporation, an Illinois corporation; AMR Corporation, a Delaware corporation; American Airlines, Inc., dba AA-MRO, American Airlines Maintenance Services, a Delaware corporation; John Doe I-X; and ABC Companies I-X,<br><br>Defendants. | NO. 12-CV-02504-FJM<br><br>**DEFENDANT ALLEGIANT AIR, ANA VINDAS AND JEFFREY TUCKER'S ANSWER TO PLAINTIFF'S COMPLAINT** |

Defendants, Allegiant Air, Ana Vindas and Jeffrey Tucker ("Allegiant Defendants"), by and through undersigned counsel, for their Answer to Plaintiff's Complaint, admit, deny and allege as follows:

## PARTIES, JURISDICTION AND VENUE

1. Upon information and belief, Allegiant Defendants admit the allegations contained in Paragraph 1 of Plaintiff's Complaint.

2. Allegiant Defendants admit the allegations contained in Paragraph 2 of Plaintiff's Complaint.

2975762.1

3. Allegiant Defendants admit the allegations contained in Paragraph 3 of Plaintiff's Complaint.

4. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 4 and therefore deny same.

5. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 5 and therefore deny same.

6. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 6 and therefore deny same.

7. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 7 and therefore deny same.

8. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 8 and therefore deny same.

9. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 9 and therefore deny same.

10. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 10 and therefore deny same.

11. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 11 and therefore deny same.

12. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 12 and therefore deny same.

13. Allegiant Defendants admit the allegations contained in Paragraph 13 of Plaintiff's Complaint.

14. Allegiant Defendants admit the allegations contained in Paragraph 14 of Plaintiff's Complaint.

15. Allegiant Defendants admit the allegations contained in Paragraph 15 of Plaintiff's Complaint.

16. Allegiant Defendants admit that there was an emergency evacuation of the airplane. Allegiant Defendants lack sufficient information to form a belief as to the truth of the remaining allegations contained in Paragraph 16 and therefore deny same.

17. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 17 and therefore deny same.

18. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 18 and therefore deny same.

19. Upon information and belief, Allegiant Defendants admit the allegations contained in Paragraph 19 of Plaintiff's Complaint.

20. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 20 and therefore deny same.

21. Allegiant Defendants deny the allegations contained in Paragraph 21 of Plaintiff's Complaint.

## COUNT ONE
### (Negligence: Allegiant, Ana Vindas, Jeffrey Tucker)

22. No affirmative response is required for Paragraph 22 of Plaintiff's Complaint, to the extent a response is needed, Defendants deny the allegations contained in Paragraph 22 of Plaintiff's Complaint.

23. Allegiant Defendants admit that Allegiant owed its passengers a duty to use reasonable care under the circumstances to ensure the safety of all passengers aboard its aircraft. Allegiant Defendants admit this duty applied to all passengers during flight and upon entry and exit, including evacuation, of the aircraft. Allegiant Defendants deny the remaining allegations contained in Paragraph 23 of Plaintiff's Complaint.

24. Allegiant Defendants deny the allegations contained in Paragraph 24 of Plaintiff's Complaint.

25. Allegiant Defendants deny the allegations contained in Paragraph 25 of Plaintiff's Complaint.

26. Allegiant Defendants deny the allegations contained in Paragraph 26 of Plaintiff's Complaint.

27. Upon information and belief, Allegiant Defendants admit the allegations contained in Paragraph 27 of Plaintiff's Complaint.

28. Allegiant Defendants admit the allegations contained in Paragraph 28 of Plaintiff's Complaint.

29. Allegiant Defendants deny the allegations contained in Paragraph 29 of Plaintiff's Complaint.

## COUNT TWO
### (Negligence: Allegiant, AAR, AA)

30. No affirmative response is required for Paragraph 30 of Plaintiff's Complaint, to the extent a response is needed, Defendants deny the allegations contained in Paragraph 30 of Plaintiff's Complaint.

31. Allegiant Defendants deny the allegations contained in Paragraph 31 of Plaintiff's Complaint.

32. Allegiant Defendants deny the allegations contained in Paragraph 32 of Plaintiff's Complaint.

33. Upon information and belief, Allegiant Defendants admit the allegations contained in Paragraph 33 of Plaintiff's Complaint.

34. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 34 and therefore deny same.

35. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 35 and therefore deny same.

36. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 36 and therefore deny same.

37. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 37 and therefore deny same.

2975762.1                                   4

38. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 38 and therefore deny same.

39. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 39 and therefore deny same.

40. Allegiant Defendants deny the allegations contained in Paragraph 40 of Plaintiff's Complaint.

41. Allegiant Defendants deny the allegations contained in Paragraph 41 of Plaintiff's Complaint.

42. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 42 and therefore deny same.

43. Allegiant Defendants lack sufficient information to form a belief as to the truth of the allegations contained in Paragraph 43 and therefore deny same.

44. Defendant denies each and every, all and singular, of the allegations contained in Plaintiffs' Complaint and each claim for relief thereof which is not herein expressly admitted or otherwise pleaded to.

## **AFFIRMATIVE DEFENSES**

45. As and for a separate defense and in the alternative, Defendant alleges that Plaintiff's Complaint fails to state a claim upon which relief may be granted against Defendant.

46. As and for a separate defense and in the alternative, Defendant alleges that Plaintiff has failed to mitigate their damages, thus barring or reducing the recovery against Defendant.

47. As and for a separate defense and in the alternative, Defendant alleges that other Defendants were contributorily negligent and/or any damages received by the Plaintiffs were the result of an intervening/superseding cause or occurred as a result of the negligence of someone other than this Defendant, all of which bars recovery to the Plaintiffs herein from this Defendant.

1    48.    As and for a separate defense and in the alternative, Defendant alleges that other parties were negligent, in whole or in part, thereby reducing or eliminating any damages owing by this Defendant by way of comparative negligence.

49.    As and for a separate defense and in the alternative, Defendant alleges that if, indeed, it is determined to be liable for the allegations alleged in the Complaint, then Defendant is entitled to contribution from other Defendants, named and unnamed, by way of the doctrine of contribution.

50.    Although Defendant does not presently have specific facts in support of the remaining defenses, it wishes to put counsel for Plaintiffs upon notice that it raises the following defenses which, through subsequent discovery may, indeed, be supported by the facts: abatement under Rule 6(f), lack of jurisdiction over the subject matter, lack of jurisdiction over the person, accord and satisfaction, arbitration and award, discharge in bankruptcy, duress, estoppel, set-off, failure to join an indispensable party, failure of consideration, fraud, illegality, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, insufficiency of process and insufficiency of service of process, and waiver.

WHEREFORE, having fully answered Plaintiff's Complaint, Defendant prays that Plaintiff takes nothing and that the Complaint be dismissed.

DATED this 4th day of December, 2012.

JONES, SKELTON & HOCHULI, P.L.C.


By _____
Kevin D. Neal
Liana J. Garcia
2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
Attorneys for Defendant Allegiant Air, Ana Vindas and Jeffrey Tucker

2975762.1                                6

**CERTIFICATE OF SERVICE**

I hereby certify that on December 4, 2012, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants.

Sharlee Meeden
_____

2975762.1                                   7

# EXHIBIT B

# In The Matter Of:
*Lazzerini v*
*Allegiant Air*

*Gregory Bode, M.D.*
*March 19, 2014*

*Griffin & Associates Court Reporters*
*2398 E. Camelback Road, Suite 260  Phoenix, AZ 85016*
*www.arizonacourtreporters.com*
*602.264.2230*

Original File GB031914.txt
Min-U-Script® with Word Index

Page 9

1] we have, Mr. Desch came to you complaining of constant
2] headaches, irritability, and trouble sleeping.
3]     Does this sound accurate?
4] A. Yes.
5] Q. He may also have been experiencing neck and
6] shoulder blade pain, and thoracic spine pain. Does that
7] sound accurate?
8] A. I don't have a recollection of that
9] independently. Are you talking about just the 2005 visit?
10] Q. No.
11] A. Just generally speaking?
12] Q. Just generally speaking --
13] A. Well, then, yes.
14] Q. -- back when you first started treating Mr.
15] Desch?
16] A. Yes. I don't remember specifically at that time
17] what the -- the headaches have been a very common theme in
18] his historical problem. So that's one I clearly remember.
19] Whether he complained of having a specific area of
20] hurting, I don't remember.
21] Q. Do you remember when you began treating Mr. Desch
22] complaining of decreased ability to play sports?
23] A. No. If I were able to look at the note, I'd be
24] happy to attest to that though.
25] Q. Well, these are my notes from his records. So

Page 10

1] these are probably not going to help you very much.
2] A. No, they wouldn't. Yeah. I do know that Mr.
3] Desch has complained to me that he has struggled to play
4] with his children because of his pain. But I can't relate
5] that to 2005.
6] Q. Okay. Understood. Do you have an independent
7] recollection of prescribing or recommending Mr. Desch
8] follow up with sleep studies when you began treating him?
9] A. Yes.
10] Q. In 2006, I have a note that Mr. Desch slipped and
11] fell off of a ladder and experienced instant pain. I know
12] you don't have the record in front of you.
13] A. Yeah.
14] Q. But does -- in a situation where Mr. Desch fell
15] off a ladder, does that ring any bells?
16] A. It doesn't. I'm sorry.
17] Q. That's all right. In 2000 -- on May 8th, 2007,
18] Mr. Desch came to you complaining of left shoulder pain,
19] with spasms of the T3 and T5 thoracic spine pain, and
20] generalized myalgias. Does that sound accurate?
21] A. I don't recall that specifically.
22] Q. In your treatment of Mr. Desch prior to 2010, did
23] Mr. Desch complain of shoulder pain, spasms in the
24] thoracic area, and generalized myalgias?
25] A. What I'll say is, if you took that directly from

Page 11

1] my note, then yes. But I don't remember that without
2] looking at my note. I'm trying to be fair in answering
3] that.
4] Q. No, I understand.
5] A. Okay.
6] Q. You would agree with me that Mr. Desch has a
7] history of generalized body pain in the time that you
8] began treating him?
9] A. That's fair to say, yes.
10] Q. In 2008, Mr. Desch came to you complaining of
11] headaches, including post-coital headaches, and you
12] ordered an MRI of his brain.
13]     Do you remember ordering an MRI brain scan
14] of Mr. Desch?
15] A. I do remember that, yes.
16] Q. Do you remember that the brain scans were
17] negative or for anything remarkable?
18] A. Correct.
19] Q. Do you have an independent recollection of Mr.
20] Desch complaining of headaches, back pain, and neck pain
21] throughout 2008?
22] A. Historically, I do remember him complaining of
23] that, yes.
24] Q. On April 17, 2009, Mr. Desch came to you
25] complaining of bilateral shoulder pain that keeps him

Page 12

1] awake at night, with an onset of nine months prior you
2] prescribed Ambien, and diagnosed him with rotator cuff
3] syndrome. Does that sound accurate?
4] A. Yes.
5] Q. In October 2009, Mr. Desch applied for disability
6] insurance, and the insurance company requested that you
7] provide them with information. Do you recall this?
8] A. No. And I may not have actually been actively
9] involved in the process of providing those records.
10] Q. Who was --
11] A. Oftentimes I would be given requests for
12] information like that. As long as the patient approved
13] it, then the staff would provide that.
14] Q. Do you have a recollection of referring Mr. Desch
15] to the Mayo Clinic for further evaluation and treatment of
16] ongoing problems with his headaches in 2009?
17] A. I remember Mr. Desch and I talking about that. I
18] don't remember whether I referred him to Mayo, or whether
19] he made an appointment to see the Mayo. Not every plan
20] requires a referral process. Sometimes you can -- I don't
21] remember doing that, but I do remember talking with him
22] about it.
23] Q. It was a suggestion you made because of his
24] ongoing headache pain?
25] A. That's very much possible, yes. I also suggested

Page 13

1] he see the Barrows.
2] Q. On December 18, 2009, Mr. Desch came to you
3] complaining of a general sense of well-being
4] not-quite-there fatigue, loss of stamina.
5]    Do you recall this?
6] A. Yes.
7] Q. Do you recall Mr. Desch having a generalized
8] sense of not being -- his well-being not being there -- or
9] strike that. That was a terrible question.
10]    Do you recall Mr. Desch having a history of
11] depression or just generalized sadness?
12]    MR. BURNETT: Form.
13]    THE WITNESS: Those are two very different
14] things.
15]    BY MS. ALLEN:
16] Q. Not necessarily clinical depression, but just an
17] over -- generalized sense of --
18] A. Something's wrong.
19] Q. -- something's wrong.
20] A. You could say that, yes.
21] Q. On June 2nd, 2010, Mr. Desch came to see you for
22] a preop. His chief complaint being bilateral upper
23] extremity, left greater than right, numbness. Does this
24] ring a bell?
25] A. Yes.

Page 14

1] Q. Based upon your treatment of Mr. Desch prior to
2] July 25th, 2010, you would agree with me that he had many
3] subjective complaints; true?
4] A. Pain is a subjective complaint. And yes, he
5] complained a lot of having pain.
6] Q. Many complaints, specifically related to his
7] head, neck, and back; true?
8] A. True.
9] Q. Did you personally ever treat Mr. Desch for
10] depression?
11]    MR. BURNETT: Form.
12]    THE WITNESS: I'd have to -- can I review --
13]    BY MS. ALLEN:
14] Q. Yes.
15] A. -- the note a minute? Based on notes I have
16] available to me, I did not treat him for a major
17] depressive disorder. And I'm not trying to skirt the
18] issue there, because we did use medications that are used
19] for depression in his case.
20]    And my reason for doing that was that those
21] medicines also had the ability to diminish musculoskeletal
22] pain signaling. And because of his multiple
23] musculoskeletal complaints, my hope was that that
24] medication would both ease his suffering and then he would
25] not feel that way. He would not feel oppressed by the

Page 15

1] pain he was suffering with.
2] Q. And that's a medication such as Lyrica?
3] A. No. It would be Cymbalta.
4] Q. Cymbalta.
5] A. Lyrica is not used for depression, but is used
6] for mood stable -- sorry. For nerve stabilizing. It's to
7] ease nerve neuropathic pain. It's also used for
8] fibromyalgia. So people who have a -- or chronic regional
9] pain syndrome, or those other kinds of things, that could
10] be used for that as well.
11] Q. Have you ever referred Mr. Desch to a doctor Paul
12] Gause?
13] A. Gause.
14] Q. G-a-u-s-e. At the Spine Institute of Arizona.
15] A. I don't recall sending him to Dr. Gause.
16] Q. Do you have an independent recollection that Dr.
17] Gause performed a C6-7 cervical fusion on Mr. Desch in
18] June 2010?
19] A. Yes.
20] Q. Was it your understanding that that procedure was
21] used to relieve Mr. Desch's neck and back pain?
22] A. Neck pain.
23] Q. Now, you saw Mr. Desch -- sorry.
24]    The accident that Mr. Desch is alleging
25] caused some of his pain, occurred on July 25th, 2010. Mr.

Page 16

1] Desch has alleged that he jumped out of an emergency --
2] went down an emergency exit slide and injured himself.
3]    You saw Mr. Desch on August 20th, 2010,
4] about a month after the emergency evacuation; true?
5] A. True.
6] Q. And at that time, Mr. Desch was still complaining
7] of generalized weakness and myalgias. You note that,
8] "These are unrelated to the above incident"; is that true?
9] A. The generalized complaints, yes. Uh-huh.
10] Q. Now, you stated earlier that Mr. Desch has a
11] history of chronic pain and fatigue. It is your -- sorry.
12]    You stated earlier that Mr. Desch had a
13] history of chronic pain and fatigue; true?
14] A. That's true. Yeah. Uh-huh.
15] Q. It was your understanding, through your records,
16] that Mr. Desch was to attend physical therapy to assist in
17] his recovery from the C6-7 fusion; true?
18] A. That was not an order made by me. That would
19] have been made by the surgeon to follow up after the
20] surgery. I believe he was given that order, yes.
21] Q. Now, according to the records that I have, Mr.
22] Desch did not return to see you again until October 5th,
23] 2010; is that true?
24] A. I saw -- right. That was -- right. I saw him
25] August 20th, and then the next time I saw him was October

Page 17

1] 5th.
2] Q. Are there other physicians in this practice that
3] would have seen Mr. Desch?
4] A. Yes. And they did.
5] Q. Who are those other physicians?
6] A. The other doctor was Dr. Clark Wysong,
7] W-y-s-o-n-g. And he saw him, at that time, between my
8] visit and the following visit with me, on September 21st,
9] 2010, for what appeared to be a gout flare.
10] Q. Any statements in those records regarding neck or
11] back pain? We don't have those records.
12] A. I do. You don't have them?
13] Q. No.
14] A. Okay. Dr. Wysong's note was limited to the
15] complaint of toe pain.
16] Q. Okay.
17] A. It did not -- he did not examine anything other
18] than the toe.
19] Q. Okay. Fair enough.
20] A. He did not make mention of any other pain at the
21] time.
22] Q. Okay. On that October 5th visit, which you saw
23] Mr. Desch, he came to you complaining of gout and neck
24] pain; is that true?
25] A. He was there to follow up on the gout visit that

Page 18

1] he had with Dr. Wysong in September. And yes, he came to
2] me also following up on his neck pain.
3] Q. And as previously established, the neck pain was
4] not a new complaint; true?
5] A. Neck pain, in general, was not a new complaint.
6] But the pain -- but I have to couch that, that the pain
7] that he had prior to surgery that was most significant,
8] was to the right. And that the surgery -- after surgery,
9] he stated it had improved, that that neck pain had
10] improved.
11] Q. And you saw him?
12] A. I saw him.
13] Q. Sorry. When did you see him after surgery?
14] A. On the date that he came in. On August 20th. It
15] said that the pain that he'd had prior to surgery had
16] gotten a fair amount better, and he was feeling better in
17] that area that the neck was hurting from. And that
18] when he -- I think my note describes it. He said that
19] after this, his neck started hurting worse again. After
20] the evacuation from the plane.
21] Q. Your note states, "He's still having neck pain on
22] his left side."
23] A. Correct.
24] Q. Do you know that the C6-7 fusion was to alleviate
25] pain on his left side?

Page 19

1] A. I don't have those notes. And I wasn't -- like I
2] said, I wasn't the one that referred him to that surgeon.
3] Q. So you can't say one way or another whether the
4] pain that he was feeling was from the surgery or from the
5] evacuation; true?
6] A. What I can say is what he told me on August 20th,
7] which was that he was doing okay after the surgery until
8] he went down the slide. And then he had started to hurt
9] more after that.
10] Q. But you cannot say, as to a reasonable degree of
11] medical certainty, in your opinion, whether his pain was
12] from the surgery or from going down the emergency slide;
13] true?
14] A. All I can say is that that was the information I
15] was given by the patient.
16] Q. Correct. You are his treating physician, so I'm
17] asking: To a reasonable degree of medical certainty, you
18] cannot say one way or another whether the --
19] A. Fair question. Sure. No.
20] Q. I'm just going to ask it again, just to clear up
21] the record.
22]    To a reasonable degree of medical certainty,
23] you cannot say one way or another whether the pain Mr.
24] Desch was feeling was from the surgery or from going down
25] the evacuation slide; true?

Page 20

1] A. I can never have a medical degree of certainty
2] about someone's subjective information.
3] Q. On that date, you recommended physical therapy to
4] work on spasms in the neck and shoulder; true?
5] A. On -- October?
6] Q. Yes.
7] A. Okay. Yes.
8] Q. Are you aware that on October 6th, the following
9] day, Mr. Desch was discharged from physical therapy from
10] his C6-7 because he was unable to improve?
11] A. No. I don't have those notes. As the physician
12] that didn't order that therapy, I wouldn't have been
13] getting notes from the therapist.
14] Q. I'm just wondering if Mr. Desch had said anything
15] to you. You're not aware that he had been discharged from
16] physical therapy?
17] A. The day after I sent him back? No. I was not
18] aware of that.
19] Q. You already established that Mr. Desch had
20] complained to you prior to July 25th, 2010, of shoulder
21] pain; true?
22] A. True.
23] Q. Okay. Have you ever reviewed any records from
24] The CORE Institute?
25] A. Can you tell me which doctor specifically?

Page 21

1] Q. Sure. Tony Nguyen.
2] A. As I mentioned earlier, if I don't make a
3]   referral to a place, they don't tend to send me the
4]   information. And I don't refer to The CORE.
5] Q. Okay.
6] A. So based on records I have available, I don't
7]   have any records from anybody from The CORE.
8] Q. So if The CORE Institute stated, "Patient was
9]   sent to us by Dr. Bode," that would not be true?
10] A. I don't have a recollection of sending anybody to
11]   The CORE.
12] Q. I understand.
13] A. Yeah.
14] Q. The next time you saw Mr. Desch was on
15]   December 30th, 2010; true?
16] A. True.
17] Q. On that date, he was there for an update on all
18]   specialists' visits for headache, shoulder pain, neck
19]   surgery, and back pain; true?
20] A. Among other things, yes.
21] Q. Your records state that, "The pain stems back to
22]   the day he had evacuated an airplane in an emergency
23]   landing, and that his energy and mood were significantly
24]   affected by the pain"; true?
25] A. Yes.

Page 22

1] Q. These were Mr. Desch's subjective statements to
2]   you; true?
3] A. True.
4] Q. Now, according to your statements previously, Mr.
5]   Desch had a history, prior to the plane evacuation, of
6]   neck and back pain, as well as fatigue and unhappy mood;
7]   true?
8] A. True.
9] Q. You would agree with me that based upon your
10]   previous statements, you cannot say, to a reasonable
11]   degree of medical certainty, that Mr. Desch's pain was
12]   solely due to his evacuation from the airplane; true?
13] A. I can agree it was not solely due to that.
14] Q. On October 3rd, 2011, you recommended Mr. Desch
15]   follow up with Dr. Maddox for his shoulder pain; true?
16] A. Sorry? You say January?
17] Q. October 3rd, 2011. We jumped ahead a little bit.
18] A. Okay. All right. Unless I have something out of
19]   order here, it looks like I had seen him on September 27,
20]   2011, July 2011, and then September 2011, and then my
21]   next --
22] Q. I'm sorry. You're correct. In September 2011,
23]   you recommended Mr. Desch follow up with Dr. Maddox for
24]   his shoulder pain; is that true? That might be the record
25]   you're referring to. I apologize.

Page 23

1] A. That's okay.
2] Q. Specifically, it looks like September 27, 2011.
3] A. Sorry.
4] Q. You're okay.
5] A. Yes, that's correct.
6] Q. Do you remember receiving a letter from Dr.
7]   Maddox in regards to the visit with Mr. Desch?
8] A. Yes.
9] Q. And in that letter, Dr. Maddox stated he did not
10]   see any real symptoms here and did not see anything that
11]   required surgery; true?
12] A. I don't think that statement accurately reflects
13]   Dr. Maddox's notes. It stated that he did have pain. He
14]   did have findings on the MRI, but weren't consistent with
15]   his symptoms.
16]     So he suggested there were some trigger
17]   points that he might try to inject and alleviate some of
18]   the pain he had in the shoulder.
19] Q. The impression is "S/P, fall of left shoulder,
20]   strain, evidence of myofacial syndrome, trigger points,
21]   medial scapula. MRI evidence of rotator cuff tendinosis,
22]   but clinically no real symptoms here. Cervical spine
23]   surgery with ongoing cervical symptoms. Discussion is
24]   showing him where trigger point is for shoulder or
25]   myofacial-type issue. I do not see anything that would

Page 24

1]   require surgical intervention."
2] A. Right. So -- I'm not trying to be picky about
3]   the words. But it didn't say there wasn't anything there.
4]   It just said that the -- what he was trying to say was
5]   that the MRI evidence of rotator cuff tendinosis wasn't
6]   found, clinically, to be symptomatic.
7] Q. Okay.
8] A. But that there was pain in the shoulder and he
9]   found some areas that he thought he might try to inject.
10]   From a trigger point perspective, their help is --
11] Q. From a subjective pain perspective, not a
12]   clinical injury perspective; true?
13] A. Well, the MRI is a very objective test.
14] Q. Okay.
15] A. And that showed there was tendinosis in the
16]   shoulder in the rotator cuff. But when the rotator cuff
17]   was tested, it wasn't symptomatic. Okay?
18] Q. Okay. And can you give me your definition of
19]   tendinosis?
20] A. That would be sort of a swelling of the tendon.
21] Q. Okay. And it can come from a number of different
22]   things; true?
23] A. Sure. Just even a thickening from prior
24]   inflammation and fibrosis even, from that. So it may have
25]   been injured previously and settled down and was left with

Page 25

1  a thickened tendon.
2  Q. I'm going to flip to March 1st, 2012.
3     On that day, Mr. Desch returned complaining
4  of pain throughout his entire body; true?
5  A. Yes.
6  Q. And again, this was not a new complaint. Mr.
7  Desch had previously complained of pain throughout his
8  entire body; true?
9  A. I don't recall him saying his "entire body"
10 before.
11 Q. Did you diagnose Mr. Desch with fibromyalgia in
12 2008?
13 A. I may have, but that's a note. And those are
14 notes I didn't have access to.
15 Q. If you had diagnosed Mr. Desch with fibromyalgia
16 in 2008 --
17 A. That would be consistent, yes.
18 Q. Consistent with pain throughout the entire body?
19 A. Indeed.
20 Q. Is it fair to say that if you did diagnose Mr.
21 Desch with fibromyalgia in 2008, you cannot say, to a
22 reasonable degree of medical certainty, that Mr. Desch's
23 body pain myalgias were due to his evacuation from the
24 airplane; true?
25 A. I would suggest that they weren't related to

Page 26

1  that. I don't believe the fibromyalgia was caused by
2  sliding down the slide.
3  Q. Okay.
4  A. Or falling off of it awkwardly, or anything like
5  that.
6  Q. Now, on March 22nd, 2012, Mr. Desch came to you
7  stating that he was doing better with his pain; true?
8  A. True.
9  Q. Prior to that date, you had prescribed OxyContin
10 to Mr. Desch; true?
11 A. I prescribed it to him in the previous visit,
12 yes.
13 Q. Do you know what if -- sorry.
14    Do you know what, if anything, changed,
15 besides prescribing the narcotic to alleviate Mr. Desch of
16 his pain?
17 A. No. I expected that the medication made it --
18 had a better control of his pain. He was on short-acting
19 medications which gives peaks and valleys of effect from
20 the medication. And I switched him to a long-acting
21 medication to give him more of a sustained relief.
22 Q. On March -- on that visit on March 22nd, 2012,
23 Mr. Desch was still complaining of poor energy, libido,
24 erectile dysfunction, and poor mood; true?
25    MR. BURNETT: Form.

Page 27

1     THE WITNESS: True.
2     BY MS. ALLEN:
3  Q. And again, these were not new complaints, as he
4  had come complained of these issues prior to July 25th,
5  2010; true?
6  A. I believe that he had.
7  Q. Is it fair to say that based upon your history as
8  Mr. Desch's primary care physician, you cannot say to
9  reasonable degree of medical certainty that Mr. Desch's
10 poor mood, poor energy, decreased libido, and erectile
11 dysfunction were caused by his evacuation from the
12 airplane; true?
13    MR. BURNETT: Form.
14    THE WITNESS: True.
15    BY MS. ALLEN:
16 Q. Do you know about how many different providers
17 Mr. Desch was seeing for his pain?
18 A. I'm aware of him seeing myself, Mr. Castillo, and
19 Dr. Pannozzo over a period of years.
20 Q. Do the three of your coordinate pain medication
21 prescriptions?
22 A. Well, I'll say that we don't -- if one of us is
23 treating them, we should be prescribing the medication.
24 If I've deferred to Dr. Pannozzo, I'll let him start
25 managing the pain medication in his -- especially if it's

Page 28

1  a controlled substance. So from that perspective when Dr.
2  Pannozzo would treat him, he would manage any narcotic
3  pain medications alone. I wouldn't do it also.
4  Q. Okay.
5  A. That's never our intention to have that happen.
6  When the patient comes back to me, if I'm taking over his
7  care, he's not going back to that doctor for one reason or
8  another, then I'll pick up the care of that again.
9     I believe Dr. Castillo -- I spoke with Dr.
10 Castillo recently about Mr. Desch, and coordinated some of
11 my management with his. He has an internal device used to
12 try to diminish his pain. I asked him if I could use
13 certain oral medications, specifically Ultram, in a small
14 dose to help him with some of his pain recently. And in
15 doing so, also alerted Dr. Castillo that he probably was
16 going to have to reevaluate the pain pump that he has
17 there and may have to adjust that when he sees him next.
18    Our coordination of care there was designed
19 to make sure that he wasn't getting more medicine from one
20 doctor, and that the other doctor knew that I was going to
21 do that with his permission.
22 Q. Okay. Is it common practice for doctors to
23 prescribe OxyContin and percocet at the same time?
24 A. For a patient with chronic pain, it is common to
25 prescribe a long-acting medication with a small number of

Page 29

1] short-acting pain pills that can be used for breakthrough
2] pain, yes.
3] Q. Let's see. The last record I have from your
4] office is dated October 5th, 2012. Is this the last time
5] you saw Mr. Desch?
6] A. My recollection is no. What was the last date
7] you said?
8] Q. October 5th, 2012.
9] A. No. I've seen him since then.
10] Q. Okay. Do you have copies of those records
11] available since October 5th, 2012, for me to review?
12] A. Not to sound -- I don't know. But if I have a
13] records release, you're welcome to have the records.
14] Q. You do. That's how we got all of the other
15] records.
16] A. Yeah. We can make that happen for you. Sure.
17] Did you say December 20, 2012?
18] Q. October 2012.
19] A. October. Okay.
20] Q. I'm going to finish up with some of the questions
21] I have, and then I'll take a look at those records. And
22] then maybe Mr. Burnett has some questions to ask.
23] A. Okay.
24] Q. Let's see. So now that we've gone through Mr.
25] Desch's medical history, and you've seen him for close to

Page 30

1] ten years or maybe slightly over that, based upon Mr.
2] Desch's history of pain in the past ten years, in the past
3] ten years that you've been Mr. Desch's primary care
4] physician, is it fair to say that Mr. Desch's symptoms of
5] neck pain, back pain, and shoulder pain, as well as down
6] mood, existed before July 25th, 2010; true?
7] A. A degree of those all existed before 2010.
8] Q. You would also agree with me that you cannot
9] state with a reasonable degree of medical certainty, based
10] upon your previous statements throughout this deposition,
11] that Mr. Desch's pain was a result of going down an
12] emergency exit slide; true?
13] A. True.
14]     MS. ALLEN: I have no further questions for
15] the time being while those records are printing.
16]     Maybe Mr. Burnett has some questions he'd
17] like to ask.
18]     MR. BURNETT: Sure.
19]     THE WITNESS: If you let me go ask the
20] office manager to get those together for you.
21]     MS. ALLEN: Okay. We can take a short
22] break.
23]     (A discussion was held off the record.)
24]
25]

Page 31

1] CROSS-EXAMINATION
2] BY MR. BURNETT:
3] Q. Doctor, my name is Thomas Burnett. I represent
4] the plaintiff in this case, John Desch. You and I have
5] spoken before, but we haven't met in person; yes?
6] A. Yeah.
7] Q. Nice to finally meet you.
8] A. And you. Thank you.
9] Q. Previously, you had given testimony that you had
10] been treating Mr. Desch for approximately a decade. Is
11] that accurate?
12] A. Yes.
13] Q. You treated him before the incident that brings
14] us here today, which was the July 25th, 2010, emergency
15] landing and evacuation; yes?
16] A. Yes.
17] Q. And you had already testified that you were aware
18] of Mr. Desch's complaints. In fact, you had diagnosed him
19] with fibromyalgia at one point prior to the emergency
20] evacuation; is that right?
21] A. Yes.
22] Q. After the emergency evacuation on July 25th,
23] 2010, the first time that you saw Mr. Desch was
24] August 20th, 2010. Was that what you had testified to
25] earlier?

Page 32

1] A. Yes.
2] Q. That visit was a follow-up visit after his neck
3] surgery; right?
4] A. Correct.
5] Q. The notes in that visit state in part -- and feel
6] free to pull them up to make sure we're on the same page.
7]     "Patient says he was doing okay after
8] surgery. And then on 07/25, or July 25th, had to
9] emergency evacuate plane. Also having a hard time
10] sleeping due to pain. At this time, pain levels are
11] between 7 to 8 out of 10."
12]     Is that roughly accurate?
13] A. That's what my note says, yes.
14] Q. And doctor, when you evaluate a patient's pain
15] complaints, you rely upon your patient to give you an
16] honest assessment of their pain levels?
17] A. Yes.
18] Q. You do this routinely as part of your practice;
19] yes?
20] A. I do.
21] Q. And in fact --
22] A. May I expand on that?
23] Q. Yes. Please go ahead.
24] A. I give people a very specific scale for pain.
25] Because many people will come and say, "Doc, I'm a 10 out

Lazzerini v
Allegiant Air

Gregory Bode, M.D.
March 19, 2014

Page 41

1. providers in your practice when assisting with your
2. patients?
3. A. I do. I try to refer to people that I trust to
4. do a good job. So, yes, I do rely on them.
5. Q. And can you say, based off of your opinion
6. before, that it is more likely than not that Mr. Desch
7. sustained an aggravation of these conditions as a result
8. of a fall off of the slide? Can you say that the
9. referrals that you made to Dr. Maddox, Dr. Pannozzo,
10. potentially Barrows Neurosurgical facility, and maybe Dr.
11. Castillo, were reasonable and necessary referrals relating
12. to his pain condition?
13.     MS. ALLEN: Objection. Form and foundation.
14.     THE WITNESS: To -- so there were two
15. questions there. The first is, I think, related to
16. whether the aggravation was likely to have been caused or
17. aggravated by the incident that happened on July 25th,
18. 2010. Yes, I believe it was aggravated by that.
19.     And the second part of the question is, yes,
20. I think that the referrals made to the specialists were
21. reasonable and necessary.
22.     BY MR. BURNETT:
23. Q. Thank you. Relating to the medical bills that
24. your office charged Mr. Desch for his treatment here, only
25. relative to the conditions and -- in fact, let me take a

Page 42

1. step back.
2.     Mr. Desch has alleged that the incident
3. caused injuries or aggravated a preexisting injury to his
4. cervical spine and to his left shoulder.
5.     As it relates to your treatment for those
6. conditions, were the bills that your office charged
7. customary in the community?
8. A. My bills are always customary, and sometimes
9. generous. I would say that many of these visits dealt not
10. just with the incident that happened or his complaints of
11. that specific area, but with a lot of other things too.
12. So the charges associated with that is, you know, a factor
13. of the total complexity of the visit, not just the reasons
14. that we're talking or the concerns we're talking about
15. today.
16. Q. We had discussed previously, an injury or a
17. condition to Mr. Desch's left shoulder. Specifically, Mr.
18. Desch -- let me take a step back. Let me find the
19. information first. I apologize. One moment. Strike it.
20.     The medical records from The CORE Institute,
21. you had previously testified that you didn't believe that
22. you had testified or that you had referred Mr. Desch to
23. The CORE Institute. Is that -- you then said maybe you
24. referred him to The CORE Institute?
25. A. What I said was I do not typically refer to The

Page 43

1. CORE Institute. I have other physicians that I trust and
2. refer to. I don't have a recollection of sending him to
3. The CORE. I have no notes from The CORE that they were
4. sending me information that I should have gotten on a
5. referral -- on a referred patient.
6.     If someone comes to me and says, "I have
7. very specific doctor that I want to go see because ten
8. people said they were really awesome and I want to go see
9. them," I might have acquiesced and said, "Sure. Go ahead
10. and go." If there was paperwork required to do that for
11. their insurance, I would have that put together by the
12. staff or myself. But I don't personally recall sending
13. him to The CORE. I don't have any notes from The CORE.
14. They sent me a referral. So I don't have any knowledge
15. about that.
16. Q. Then we'll go off the basis that you don't have
17. any knowledge of The CORE Institute or the treatment that
18. was rendered?
19. A. Yes.
20. Q. In that event, I'll stop my questioning there.
21. A. Okay.
22.     MR. BURNETT: I actually have just a couple
23. more.
24.     MS. ALLEN: I knew what you meant.
25.     MR. BURNETT: You knew what I meant.

Page 44

1.     BY MR. BURNETT:
2. Q. John Desch is still your patient; right?
3. A. Yes.
4. Q. As it relates to his cervical spine and left
5. shoulder problems, what is his current prognosis?
6. A. Fair, at best. John has never had a robust
7. response to treatment of other conditions, unrelated to
8. this one, in terms of his pain. And not in small part due
9. to, you know, longstanding chronic headache problems that
10. he's had. And so, you know, I hope to help him be as
11. functional as we can get him, but -- and I'm also hopeful
12. that Dr. Castillo can provide him some better pain relief
13. when he sees him again.
14.     You know, my hope for John is to get his
15. pain level sort of 4 or 5 out of 10, so that he can still
16. interact with his family and have a quality of life and,
17. you know, play with his kids, and work, and help provide
18. for his family. Those are the things that -- those are my
19. personal realistic goals for him, and probably always have
20. been my goals for him. We're always more hopeful, you
21. know, but cautiously hopeful.
22.     And so as it relates to his overall
23. function, I'm more about the function than a pain score.
24. In fact, I'm chief medical officer for a functional
25. restoration program. It's what we do all day. We take